### HAFFNER et al. v. CRANE et al.

(District Court, E. D. New York. February 18, 1902.)

1. NEGLIGENCE—PRIMA FACIE EVIDENCE—FALLING OF VESSEL IN DRY DOCK.

Where it is shown that a yacht which was very sharp in form, and others of similar construction, had been frequently and safely raised and lowered on dry docks, held in position only by blocks, without shoring, the falling and injury of such vessel as she was being lowered from a dry dock in which she had been placed for repairs, and when supported by blocking, is prima facie proof that she was negligently placed or handled by the owner of the dock, who owed the duty of ordinary care and skill in the premises; and such proof must be met by evidence of some unusual or abnormal condition existing, to exonerate him from liability for the injury.

2. SAME—EVIDENCE CONSIDERED.

Evidence considered, and *held* insufficient to support the claim of the owners of a dry dock that the falling of a vessel supported therein by blocking resulted from the giving way or springing of her plates, or to overcome the presumption of negligence arising from libelants' evidence.

In Admiralty. Action to recover damages for injury of vessel in dry dock.

James J. Macklin, for libelants.

McKenzie & Beebe (Robert D. Benedict, of counsel), for respondents.

THOMAS, District Judge. The yacht Wanda, on the respondents' sectional dry dock at Brooklyn, that she might be painted, fell to starboard, as the dock was lowered to discharge her. For the injury received, the libel is filed. The respondents' duty was to use the care that a good business man, skilled in the vocation, would observe under the same circumstances. The Wanda was very sharp in form, and the respondents' care required due consideration of the fact. The evidence shows that the Wanda and two other vessels, known as the "Glen Iris" and "Wilbur," were similar in shape, and that each of these vessels had

frequently and safely been raised and lowered on dry docks in New York, held in position only by blocks, without the additional precaution of shoring, and that, as regards the Wanda, this had been done but a few months before. Hence the first conclusion is that the use of shores was not distinctly necessary, nor customary, and that the employment of proper skill and care in blocking was sufficient to protect the vessel. The next necessary conclusion is that, inasmuch as the Wanda and similarly sharp vessels usually are protected by proper blocking, without the precaution of shoring, the fall of the Wanda in the present instance indicates that the respondents' blocking or handling failed in the result that usually skilled and careful blocking effects. From such history, standing alone, it should be inferred that the respondents were negligent. This inference may be drawn in the present case, not from the sole fact that the Wanda fell, but because she fell when she and others similarly shaped had stood safely. To stand when properly blocked and lowered is the normal condition, and indicates the result of due care and skill; hence her fall is an abnormal result, and indicates lack of due care and skill, in the absence of unusual conditions. This inference would not shift the burden of proof, for the burden does not shift. Certain facts present make a prima facie case for the libelants, which the respondents must meet, but the necessity of producing a preponderance of evidence remains with the libelants. Therefore the next inquiry is, were there other conditions present that should defeat the inference of negligence? Is the evidence in this regard produced by the respondents outweighed by the evidence of the libelants, who have the burden, as well as the benefit, of the inference above stated, and of such other evidence as sustains the charge of fault? The respondents offer evidence which tends, to some degree, to establish that the respondents used due care in ascertaining the kind of blocks that had been used in raising the Wanda by another person in the spring of the same year, when she stood safely; that they carefully and skillfully adjusted such blocks; that they used similar diligence in lowering her; and that the fall was caused by the weakness of the ship's plates which received the pressure of the blocks. Notwithstanding the evidence of the respondents' witnesses that the blocks were fitted properly, and that usual and due care was employed in handling, the fact of the fall, when she should not have fallen if due care and skill had been employed, disputes and outweighs the evidence of the witnesses that such care was used, in the absence of other proven cause. But it should be kept in mind that this conclusion is not justified if it appear that some abnormal condition was present in the ship that would not allow properly fitted blocks to be usually effective. This brings the consideration to the respondents' contention that plates gave way and caused the fall. The learned advocate for the respondents contends that the weight on the plates broke or depressed them; that this caused sufficient jar on the blocks to start them, and thereupon push them to the side of the dock; hence the fall of the vessel was permitted. The argument rests upon three premises: (1) The breaking or denting of the plates before the fall; (2) the consequent jarring of the vessel against the blocks; (3) finally, the thrusting away of the blocks by reason of such jar. Of these three premises, the last is certain, viz., the

upper blocks were pushed away towards the side of the dock; but whether this was effected in the first instance by a jar from the plate breaking or indenting, or from the giving way of the dogging on the blocks, or other cause, depends upon the inferences to be drawn from the evidence. The alleged evidences that it was caused by the breaking or yielding of the plates are these: (1) The plates were thin, corroded, and feeble in strength; (2) the depressions and cracks in the plates were at, or in proximity to, the place where the blocks had rested when the vessel was in position; (3) the blocks were not in the holes where the wounds were, as they would have been if they had been caused by the bringing up of the vessel at the end of the fall, for the diver was able to place patches over the cracks in the plates, without any raising of the vessel from the position where she brought up; (4) there were no other blocks on the dock on which the vessel fell. This argument is that feeble plates were found broken or indented at or near by the places where the blocks were fitted, but no blocks were found covering the breaks after the vessel fell, as would have been the case had the vessel fallen on the blocks.

Consider the alleged insufficiency of the plates, under the proper rule, that the respondents were entitled to assume that the plates were sufficient to withstand the pressure that would come on suitable blocking, with the vessel properly handled. The vessel had been raised with a list of the dock to port (that is, towards the gates that let in the water), and she was lowered with the list to starboard, whereupon she fell. The respondents gave evidence tending to show that the list of the dock to port was a few inches, which remained during the 48 hours the vessel was on the dock previous to the attempt to lower her, and that in lowering the port list was overcome, and that a similar or perhaps somewhat larger list was given to starboard, and that the port and starboard list was that usually present in raising and lowering. The libelants' evidence is that the starboard list was greater, by a foot or more, than that described by the respondents' witnesses. Assuming that the respondents' evidence is correct,—and it is certainly equal in probative force to that of the libelants,—the vessel was blocked upon an even keel, with an incline of the dock to port, and she was lowered with a similar incline to starboard. That is, the uneven pressure on the port blocks was changed to the starboard side, with what abruptness may only be conjectured from the nature of the maneuver and the manner in which it was done. However, it is shown that vessels are usually and safely raised and lowered with a similar or greater list. It is argued that the port plates were strong enough to withstand the uneven pressure upon them, and the starboard not, although in March or April, 1899 (the accident was on October 24, 1899), 37 new plates had been distributed on both sides of the vessel, and all deemed unsuitable by the examiner had been taken out. Yet upon the present trial he stated that the plate shown him was not a proper one to stay. Nevertheless the fact remains that in the previous March or April, with the same plates, and with what is said to be the same kind of blocking, the vessel was raised and lowered safely. In considering this question, it should be observed that the port plates were not subjected to the strain caused by the changing of the list from port to starboard. She

was raised upon the port list, and when the change was made to starboard the strain was transferred to the starboard side in such a manner that the vessel herself probably to a slight degree listed with reference to the dock. The strength of the plates, and the pressure thereon, was the subject of conflict. There was expert evidence that the plates were insufficient and improper for the purpose of raising the vessel, but there are two items of evidence that point to the truth with greater distinctness than do the mere opinions of witnesses. One of the plates was produced in court and submitted to respondents' witness Quinn, who stated that, at the request of the respondents, he had made an examination of the vessel's plates after she had been raised in position on the dock after the accident; that he made with his hammer a hole in one of her plates (that he did break through a plate over the coal bunker in strake D is established); and that her plates were generally in unsuitable condition for hauling, although, unlike respondents' other witnesses, he testified that, in the case of a vessel as sharp as the Wanda, if a dock had a starboard list of four inches, he would not have regarded bilge blocks as sufficient support, irrespective of the condition of the plates. But the opportunity was presented of testing the plate produced (Exhibit E), inasmuch as the witness had his testing hammer, and the record shows as follows:

"Q. What do you consider the size of this plate, in thickness? A. I can tell you mighty quick. Q. Do you think you could tap that with a hammer? A. Yes, sir. Q. Do it. (Handing the plate to the witness.) A. Give me two books. Have you two books here? I will show you the sound of it in a second. (Striking the plate with the hammer many times.) Q. I want you to break it? A. Oh, I can very easily do that. (Hammering the plate very hard.) That will bend there. See that? Q. Would it break it in two? A. If that was in position I would break it through, if it was fast."

The fact was that he pounded repeatedly with great vigor upon the iron, and could not break it. Thereupon he gave many blows upon the edge of the plate, and, after much effort, revealed the bright, clear edge of the steel. This attempted demonstration was a complete failure, and very unfavorable to the respondents, in view of the evidence of Lassoe, to which attention will now be called; for an important inquiry is, what pressure was brought to bear upon these plates, and how much were they able to withstand? The evidence of all the witnesses is to the effect that the principal weight comes upon the keel, even when there is a list to the extent shown in the present instance. Lassoe stated that, with a foot list to starboard, "the keel would sustain the greater part,—probably over 95 or 96 per cent. The bilge blocks would get the downward and outward pressure." Lassoe also gives the following evidence:

"By the Court: Q. Supposing the dry dock is 64 feet wide, and there is a list to starboard of 6 inches; how much would the Wanda list? A. Do you want it in degrees? Q. No; in inches. How much would she list? A. 9/32 of 8 inches. Q. Suppose the Wanda was listed over on the dock, we will say, a couple inches, when the vessel was hauled out or raised, and was blocked there suitably, and in lowering the dock it tipped 6 inches to starboard. Would that shift the position from port over to starboard on the blocks? A. It will have less inclination to starboard; that is, a few inches less. First she was hauled up with 2 inches list to port; then in lowering you give her 6 inches list to starboard. Q. Give the dock 6 inches? A. Well,

the dock had 2 inches at first, and in docking the ship it will be upright there. Q. I want to know if, on a change of the dock from 2 inches to port to 6 to starboard, it will cause any misfit on the blocks? A. No; I don't see it, because the ship will follow the dock. Q. Then as she went over to starboard the ship would not change her position on the blocks? A. Not on the blocks. Q. Can you state, with the Wanda listed to starboard 2 inches, how much outward pressure it would bring on the blocks? A. I would have to know the weight of the Wanda. I suppose it is about 200 or 250 tons. If it is 250 tons, and she listed 2 inches to starboard— Her beam is 18 feet. It was 2 inches in 9 feet. Then really the diameter would be 18 feet, and the circumference 56. One-quarter of that is 14 feet. That is a quarter of a circle. And the 2 inches is $1/84$ part of the weight of the Wanda, and there would come on the bilge blocks, on the 5 blocks, $1/84$ part. If she was 250 tons, that will be about 3 tons,—about that. $1/84$ part would come on the 5 blocks. At 45 degrees there would be only an outward pressure of one-half of that again, and at 45 degrees one-half of that would be an outward push of $1/2$ of $3/8$ of a ton on the block outward. Q. On each block? A. On each block. And that is about $1/8$ of a ton. Q. So the question is whether each plate was strong enough to stand the pressure of $1/2$ of $3/8$ of a ton? A. Yes, sir. That is $3/10$ of a ton. Q. Do all these blocks rest up closely against the side of the vessel? A. Yes, sir; if they fit. Q. Assuming they fit fairly well? A. Yes. Q. Then with 5 blocks what would be the pressure, supposing they are built up 5 feet,—I mean per square inch on the blocks? A. Are they 8-inch wide? Q. 8 by 12? A. It is only where they are in contact. It will be about 7 pounds to the inch. Q. In your opinion, could the plates that you saw where the break was bear that pressure to the square inch? A. The metal is what we call 'rotten.' If you put it in a testing machine, it won't show at all in places where it is pitted by corrosion, so it is hard to tell. It will give in the weakest point. If it had been a new plate, it should have been a mark exactly the size of the bilge block, if it had been a hard substance. Q. Take the weakest part; would it bear that,—take the weakest plates you found? A. You mean the plate which we have here? Q. Yes; take that plate? A. It ought to hold more. You would think so by the thickness of it, still the strength may be entirely out of it. Q. Taking it as you examined it, and the plate as you see it, the question is whether it should bear that weight at the weakest point? A. It may not bear anything. It is very hard to tell. I have had experience in testing material a good deal, and sometimes we find old material that has deteriorated that will give way without any strain, almost, on it."

If, now, the test made by Quinn be considered in connection with the pressure to which Lassoe testifies, it seems unquestionable that the plates were far more than sufficient in strength to withstand the strain put upon them. It is inconceivable that pressure so slight could have dented or cracked the plates, and the plate produced is understood to have been cut from the very place where the respondent Alfred M. Crane thought the fall was initiated; that is, the locality of the second after-bilge block. It appears from the evidence that the plates were about 3 feet wide, and that they were supported by frames 21 or 22 inches apart, and by butt straps at the ends, with the intention of making the strength at the butt equal to the usual strength of the plate at other parts. It further appears that at a point 40 feet from the stern there was a spot depressed some 6 inches, but the plate was not broken. The fact that this dent was made without the breaking of the plate itself indicates a good quality of material, as Lassee stated; and it is not believed that the slight pressure brought to bear upon that plate could have produced this result, but, rather, that it must

have been caused by the vessel bringing up on the dock. In this connection it may be said that while it is claimed by the respondents that there were no other blocks in the vicinity at the side of the vessel, except those used for the blocking, the evidence is disputed by the libelants' witnesses, who testified that there were blocks scattered about the dock, and by the undisputed evidence that there were several other dents made on the side of the vessel, where there is no pretense that the supporting blocks were; and even Crane, one of the respondents, says that there were blocks about the dock here and there, not in use, and that it was those blocks that made the dents, other than those alleged to be at the places where the blocks were placed. Moreover, the permanent or foundation block remained. The dent in the after part of the vessel, to which attention has just been called, is not entirely covered by the blocks, as shown in the photograph taken after the vessel had been raised the second time. It is true that Alfred M. Crane states that the blocks used at the time of the second hauling were not as high as those used on the first occasion, but Walter D. Crane, the other respondent, states that the blocks used on both occasions came up just the same, although he finally stated: "I wouldn't swear if we put them higher or lower. I am not quite sure, but I think they come about the same as the old blocks." Taking this evidence in connection with that of the libelants, it is not proven that the blocks on the first occasion covered this dent. Lassoe states that forward of this, and between the second bilge blocks, 2 and 3, there was a crack in the plate; that there was a dent between blocks 3 and 4, and that forward of block 4 the bilge plates had parted in the butts, the rivets being sheared; and that the plate below was cracked in the rivet hole, the crack extending in three or four inches. It is possible that the upper part of the block might have reached the crack described as extending in three or four inches,—probably more; but it is not probable that it reached the place where the plates had parted at the butts, and where the rivets were sheared. In fact, Lassoe explains that the parting of the plates above was not caused immediately by the pressure upon them, but the cause of the shearing was the strain brought on the rivets by extending the plate; that the pressure inward could not shear the rivets; that there must have been a pressure lengthwise to shear the rivets clear out; and his final statement seems to be as follows:

"Q. Then the point where the block was must have been stronger than the butts? A. Well, yes; it is hard to tell. Q. Then if the butts were $3/16$, re-enforced by a fish plate, that would show a pretty strong plate outside, wouldn't it? A. Yes, sir."

This evidence indicates a strength in the broken plate so considerable that a finding that it yielded under the pressure is inadmissible. This witness further said:

"There is an indentation between No. 2 and No. 3 which shows the crack in the plate in the C strake, and it shows the donkey suction above which I stated was corroded. The plate was corroded away in the strainer part of her. This photograph [A] is the same showing the same crack on a larger scale, between 2 and 3."

The witness also stated:

"This photograph [B] shows No. 4 bilge block and the parting of the plates to the right in C strake, showing that the rivets have been sheared off, and the plate below is cracked quite considerably from the rivet hole down."

His attention being called to the crack as shown in photograph C, he said there was a crack there, but that he could not identify it. The nature and direction of the wounds is shown by the photographs, and, as each of the plates is three feet in width, the relation of the blocking to the injured plates may be inferred, provided the evidence of the respondents be accepted,—that the blocks were placed in that locality. Nevertheless it is difficult, considering the depressions in one place, the directions of the cracks in others, and the pressure that was brought upon them, to conclude that they were caused while the blocking was yet against the side of the vessel, and before it fell, inasmuch as the violence of the fall was calculated to produce the same conditions. After a vessel of her weight and height of hull had fallen, the broken condition of her plates is a natural and proximate consequence; and that broken condition may not be shifted to the moment when she began to fall, so as to be assigned as a cause of such fall, without evidence more clearly pointing to the origin of the accident than has been produced by the respondents.

In reaching this conclusion, the respondents' contention has not been overlooked, that the cracked places were not covered by blocks after the falling. Such contention is not without force, even in view of the conflict of evidence; but what happened while the vessel was falling from strain, or after she fell and before she took the position where she finally lay, must be known indefinitely, and the inferences favorable to the respondents do not overcome the stronger inferences to which attention has been called. It is true that the pressure upon the blocks would be the same as the pressure upon the plates, and that pressure is shown to have been slight. It may be argued that, if the pressure were not sufficient to cause the plates to break, it would not be sufficient to push aside the blocks, dogged as they were; and it is here that the chief difficulty of solving the question is found. But if it be determined in the first instance that the plates were sufficient, then the presumption of negligence, to which earlier attention has been called, arises, and it is necessary for the respondents to meet the same. It is not obligatory upon the libelants to show that the dogging of the blocks or the fitting of the blocks was improper. The fact of the fall shows the lack of care or skill in some particular.

Pursuant to the foregoing views, the libelants should have a decree.