**JOHNSON'S BRANFORD BOAT YARD, INC., Libellant,**

v.

**The YACHT ALTAIR, Her engines, tackle, and equipment et al., Respondents.**

No. 4762.

United States District Court
D. Connecticut.

Jan. 11, 1966.

Macgregor Kilpatrick, Branford, Conn., for libellant, with whom was Anthony J. LaSala, Wayne, N. J.

Thompson, Weir & Barclay, New Haven, Conn., for respondents, by Robert N. Schmalz, New Haven, Conn., of counsel, with whom was Daniel A. Sullivan, New York City.

MOORE, Circuit Judge.*

*Jurisdiction*

The question of jurisdiction (originally disputed) was resolved by the courts in a pre-trial order (filed June 2, 1965) as follows:

"This action was brought pursuant to the Admiralty jurisdiction of the District Court. The libelant is a Connecticut corporation with its principal place of business at Branford and the respondent person, J. Walter Jacoby, is a citizen of the State of New York. The respondent, Yacht "Altair" is a thirty-six foot sloop which at the time of the commencement of the action was located in the libelant's boat yard in Branford. Both parties concede that this Court has jurisdiction of the controversy."

*The Facts*

The facts chronologically commence with satisfying certainty, deteriorate to a purgatorial stage of dispute and then trail off to that Stygian obscurity where even the court by means of judicial fiat, inference and speculation cannot possibly justify stating them under a heading of "Findings of Fact".

Dr. J. Walter Jacoby, respondent, of Northport, New York, owns the thirty-six foot sloop "Altair". In the late Fall of 1963 he delivered the sloop to libelant, Johnson's Branford Boat Yard, Inc. (the Yard) for winter storage pursuant to a written contract (Exhibit B), entitled "Winter Storage Contract Condi-

* Of the Second Circuit, sitting by designation.

tions Season 1963 thru July 15, 1964". The owner was requested to check "FOR YOUR PROTECTION" any of seven items. Items relating to the boat, i. e., 2, 3, 4, and 5 such as winterizing motor, pulling and re-stepping mast, etc., were checked. Item 6, which stated *"If boats and gear are stored at Owner's risk* (your Insurance) Yard will not be responsible for loss of boat or gear due to vandalism, fire, theft, or storms," was also checked, but Item 7, "If stored at Yard risk the Winter Storage Rates will be increased 25% to cover insurance costs," was not checked. No proof was submitted that the damage subsequently incurred resulted from any of the four causes excepted in Item 6.

Dr. Jacoby also ordered certain repairs to be undertaken while the boat was in storage. For this purpose, the "Altair" was placed in a shed where these repairs were made. Up to this point, all is clear judicial sailing. Dr. Jacoby is liable for the storage charges, the cost of performing the work required under Items 2, 3, 4, and 5, and for the repairs specifically ordered. These repairs were written on a work order #1984 on November 7, 1963, and priced as "Total Labor $961.25", "Total Parts $175.27" and "Sales Tax $6.13"—"Total $1,142.65" (Exh. F). Unless this work order contained estimated future charges, it would not have included work which would have been performed in the Spring such as re-stepping the mast, etc.

A sheet (apparently a ledger sheet) of the Yard (Exh. J) headed "Mr. J. Walter Jacoby", purporting to list charges and credits, shows charges of $259 under date of "10–31" [1963] and $41.15 under date of "1–6" [1964], or a total of $300.15. There is no indication of whether this amount includes any or all winter storage, the work required under Items 2–6 or the ordered repairs. However, the conclusion is easily reached that this amount falls under one or more of these categories and that Dr. Jacoby, except insofar as he has paid them, owed the Yard for these items.

The work apparently finished, the "Altair" had no continuing reason to occupy the shed. She was taken outdoors to join some four hundred other boats in the Yard and placed in a cradle. The date of this move may well have been on or somewhat before January 9, 1964, but the exact date is not important. That afternoon (January 9th), Dr. Jacoby and a friend together with the manager of the Yard, climbed aboard the "Altair" in her apparently secure cradle and inspected the work. No expressions of dissatisfaction were forthcoming, and Dr. Jacoby left, probably thinking of many enjoyable hours at the helm after the "Altair" had found her way back to a more normal habitat (approximate launching date specified in contract as May 1, 1964). But at this point, factual certainty ends.

On the evening of January 9, 1964, and sometime before 9:30 P.M., the "Altair" fell over in or from her cradle with resulting damage to her port side and certain interior structures. As in almost all marine damage cases, the experts testified from backgrounds of vast experience, with skill and so-called expertise. For the Yard, the testimony may be summarized thus: the construction of the cradle, judged by the experience of the successful cradling of hundreds of boats, was proper and adequate for the purpose in every respect. Naturally, the experts for Dr. Jacoby (and I suspect they would not have been witnesses otherwise) with equal experience and skill had quite a different view. They would not have so constructed the cradle and gave very plausible reasons for their positions. I am satisfied that all experts gave their best and most honest opinions but neither they nor the court will ever know why the cradle collapsed. Possibly the "Altair" herself did not like her strange surroundings and decided to take the initiative. However, although the battle of the experts may be inconclusive, legal liability is not dependent upon resolving their differences. Somewhat anomalously, this action was commenced by the Yard by libel to re-

cover the charges for the repairs caused by the fall. Naturally, the owner disclaimed liability and by cross-libel sought not only to be exonerated of such charges but additional damages claimed to be due for defective repairs and for loss of potential charter hire.

The pre-trial judge in his pre-trial order stated the issues for trial to be:

(1) "Was the storage contract of the boatyard such that it became a bailee for hire and thereby subject to the obligations thereof?"

The proof clearly requires an affirmative answer to this question.

(2) "Was the boatyard, through its agents or employees, negligent in storing, blocking and bracing said boat to prevent it from falling?"

(3) "Were the repairs performed by the boatyard done in a workmanlike manner in keeping with standard and accepted shipyard custom and practice in the area?"

When Dr. Jacoby surrendered the "Altair" to the exclusive custody and control of the Yard, he had every right to believe that the sloop would be redelivered to him in an undamaged condition. Absent some proof by the Yard that the damage was caused by one or more of the four exceptions in Item 6 of the storage contract or some legally exonerating explanation as to the cause, the Yard would be liable. The design and method of construction of the cradle and the location thereof were all selected by the Yard.

The Yard undoubtedly believed that the cradle as built and located was adequate for the purpose of safe storage but belief is not enough. A decision has to be made as to liability between an owner who had no part in the construction or location of the cradle and the Yard which entered into a contract of safekeeping.

The law relating to a bailee's liability is clear. A concise statement of the principles applicable here is to be found in Erlbacher v. Republic Homes Corporation, 263 F.2d 217 (8 Cir., 1959) at 220:

"The burden of establishing negligence on the part of the bailee was, of course, on the bailor and that burden did not change through the trial. Proof that the yacht was delivered to the bailee in good condition and was damaged while in the exclusive possession and control of the bailee, however, established a presumption of negligence. Thereafter it became necessary, if the bailee would overcome that presumption, to go forward with the evidence and show that due care was exercised."

By proof of delivery of the boat in good condition and by proof of damage while in the bailee's possession "the bailor makes out a prima facie case of negligence; * * *". Stegemann v. Miami Beach Boat Slips, 213 F.2d 561 at 564 (5 Cir., 1954) and authorities therein cited.

Although there was credible testimony on behalf of the Yard that its cradle construction was adequate, there was equally credible testimony to the contrary. The Yard, therefore, has not overcome the presumption imposed by law and must be held liable for the damages caused by the fall.

This case is quite different from those cases where the boats in storage were destroyed by fire or hurricane. See Buntin v. Fletchas, 257 F.2d 512 (5 Cir., 1958) and Niagra Fire Insurance Co. v. Dog River Boat Service, Inc., 187 F.Supp. 528 (S.D.Ala.1960). The bailees in those cases convinced the trier of the fact that all reasonable precautions had been taken for safe storage and that forces beyond their control were responsible for the destruction. Here, although the Yard's customary method of cradle construction was believed to be adequate (and apparently had been for other boats), it obviously was not for the "Altair".

A somewhat analogous situation appears in Harrison Brothers Drydock & Repair Yard, Inc. v. Atkins, 193 F.Supp. 386 (S.D.Ala.1961) where the repair yard (as here) sued the owner of a vessel for repairs caused by damage suffered in the yard. The court there held that

the libelant had failed to overcome the presumption of negligence and was not entitled to recover for the repairs. See also Haffner v. Crane, 115 F. 404 (D.C. E.D.N.Y.1902) (yacht fell while in dry-dock).

Although this decision as to liability rests upon the failure to overcome the presumption, the Yard manager testified in answer to the question, "Now, I ask you, absent any unusual circumstances, does a boat fall from a properly constructed shoring? A. No, it does not." The question, of course, is both conclusory and hypothetical, but does reveal a likely reason for the presumption.

Under date of January 30, 1964, the Yard submitted to Dr. Jacoby an "Estimate to repair 36-foot sailboat damaged in a fall:" (Exh. D). It contained 29 items, each separately priced, the total being $6,665.00. Dr. Jacoby, empowered by his insurance brokers to authorize the Yard to make the repairs, so advised the Yard (Exh. E) with the qualification that "Since it appears that there is a strong possibility that your Yard is responsible for this loss, I have been advised to inform you that I hold you responsible for the damage to the yacht."

Apparently, the repair work in large part specified in the estimate (Exh. D) went forward because under date of March 11, 1964, a two-page list of items entitled "Repairs to 36-foot Sailboat" (Exh. C) was prepared and addressed to Dr. J. Walter Jacoby. The "Total Labor and Materials" thereon amounted to $6,320.00. The items in their description bear a close resemblance of the items on the estimate (Exh. D) although the number of items differs by one. A third exhibit (Exh. I) was introduced, consisting of three undated pages but bearing the same work order number as the bill of March 11, 1964, which obviously includes many of the same items as Exhibits D and C. However, only total labor and material prices are stated as labor 1,074 hours at $5.00 per hour and materials as $953.10, which with Connecticut Sales Tax total $6,356.46. There are a number of items on this exhibit which would appear to be no part of the repairs necessitated by the fall—for example, "43. Step and rig mast" and "40. Remove three-bladed wheel and install the two-bladed prop."

Since it is my conclusion that the Yard is responsible for all repairs and damages caused by the fall, the question whether they were performed in a workmanlike manner merges with the next pre-trial issue.

(4) "Were the further repairs alleged to have been required after the yacht had been delivered to the cross-libelant [Dr. Jacoby] necessary to correct the damages caused by the libelant's alleged poor workmanship?"

After the Altair left the Yard in May 1964, she sailed across the Sound to Northport. Apparently, she leaked badly and was taken first to the Seymour yard and then to the Knutson yard. Surveys were held at both yards, attended by representatives of the insurance companies insuring the Yard and Dr. Jacoby, respectively. The only tangible evidence of the June 10, 1964, survey by the two surveyors, Erden and Levin, is their long-hand signed review of the Yard's March 11, 1964 bill and the repairs purported made and listed thereon. Insofar as they "noted as questionable" items as to which they thought the prices appeared to be excessive, their comments are academic because no recovery of any item on that bill is being allowed. However, they did question proper performance of certain items.

The Altair was then taken to the Knutson yard where extensive work was done. The Knutson bill was $1,570.93 (Exh. 3). Of this amount, the surveyor for Dr. Jacoby's insurance carrier testified that items totalling $1,462.83 were necessary because of work not accomplished or not accomplished according to yacht standards. To this a $500 figure was added for repairing the deck and $76 for hauling at the Seymour yard. The surveyor for Dr. Jacoby's insurance carrier authorized payment to Dr. Jacoby of these amounts, i. e., $2,038.83.

Upon this record, it is impossible to answer the question as to whether all further repairs were required because of allegedly faulty repairs by the Yard. The Altair was a comparatively old boat. Probably a great deal of work could have been done for its benefit regardless of the fall. There was testimony that 39 frames were installed, 34 in addition to the 5 broken by the fall and that some showed old breaks. The deck apparently did not leak when tested at the Yard. Three of the items on the Knutson bill total $1,010. How much was caused by the fall and how much was due to age probably defies computation. Naturally, the fall for which the Yard is liable did not benefit the Altair and, although repaired, may well have accounted for some of the trouble which ensued.

■ Courts are frequently required to find answers to questions which cannot be answered in order that there be some finality to disputes. But the parties themselves will have to provide some assistance. As of May 21, 1964, Dr. Jacoby had paid the Yard $1,297.31 against charges of $697.46, thus leaving him with a credit of $599.85. On May 29th the Yard charged Dr. Jacoby on work orders 1984, 2134 and 2055, $7,499.11 (Exh. J). To work order 2134, which bears on its face "Craig Johnson 3/10/64 Misc. jobs done on boat not covered by other work order," (Exh. H), are annexed six yellow pages and five white pages containing scores of minute items for materials as well as hours of labor. Work order 1984 (Exh. F) also written by "Craig Johnson 11/7/63" is obviously for repairs ordered by Dr. Jacoby. The total thereon is $1,142.65. The work covered by work order 1984 is allowed to the Yard. All or such part of work order 2134 as may relate to work ordered by Dr. Jacoby is allowed to the Yard. All or such part of work order 2134 as may be attributed to the fall is disallowed. All of work order 2055 is disallowed. If the parties cannot agree as to the proper allocation of the items listed on 2134, further application may be made to the court.

■ As to the items totalling $2,038.83, authorized by his insurer to be paid to Dr. Jacoby, $576 (deck and hauling) is disallowed to Dr. Jacoby. Unfortunately (at least for the court), King Solomon did not have any boat repair cases before him which have been reported. Therefore, there is no way of emulating his wisdom. Considering the age of the Altair, his division-in-half solution scarcely seems fair, yet there is enough in the record to justify some allowance in favor of Dr. Jacoby and against the Yard for the further repairs listed on the Knutson bill (Exh. 3). The court allows Dr. Jacoby $500 of this amount.

(5) "Was the period of loss of use and the claims therefor reasonable under the circumstances?"

■■ Dr. Jacoby kept the Altair for "recreation and pleasure". In 1964 he listed the boat for charter with one broker in Northport for $395 a week. He had not chartered in the past. Dr. Jacoby claims that as a result of inability to use the boat in a portion of May, June and July 1964, he was deprived of charter hire for ten weeks at a price which he fixes at $300 a week. He testified that he usually used the Altair for cruising in July and later in the summer. All in all, Dr. Jacoby's charter experience was limited to two separate weeks in 1965 at $395 a week. He did not advertise the boat for charter in such magazines as "Yachting", "Rudder" or the "Maine Coast Fisherman". There is insufficient proof of any history of charter upon which to make any award for loss of charter hire. As to loss of use, Dr. Jacoby's purpose in having the Altair "to keep me [him] from getting a coronary" seems to have been achieved because the doctor appeared to be in excellent health. This priceless attribute, the unascertainable value of which Dr. Jacoby eloquently fixed in his rhetorical question-answer, "How do you measure the value of health, * * * ?", does not lend itself to legal evaluation. Usually it is the deprivation of this valuable asset which comes before the courts for financial assessment. No damage for loss of use

has been established and, hence, this claim must be disallowed.

The parties may submit such proposed decree as they deem appropriate.

The findings of fact and the conclusions of law appearing herein shall constitute the findings and conclusions as required by 52(a) of the Federal Rules of Civil Procedure.

No costs.