The **ENGLISH WHIPPLE SAILYARD, LTD.**

v.

The **YAWL ARDENT.**

**Civ. A. No. 75–105 Erie.**

United States District Court, W. D. Pennsylvania.

Oct. 30, 1978.

**19. Interest** ☞39(1)

John English, Jr., Erie, Pa., for plaintiff.

Edwin L. Klett, Pittsburgh, Pa., James F. Toohey, Erie, Pa., for defendant.

### STATEMENT OF CASE, FINDINGS OF FACT, DISCUSSION AND CONCLUSIONS OF LAW

KNOX, District Judge.

A. Statement of Case

There is before the court a bitter dispute in admiralty as the result of the purchase, installation of additional equipment on, and sinking of the Yawl "Ardent" at Erie, Pennsylvania.

Plaintiff, being unable to adjust its claims as to amount due issued a warrant of arrest in rem on August 27, 1975. On the same day, a bond was presented for approv-

al to Judge Teitelbaum of this court who ordered the vessel released.

The defendant[1] thereafter filed an answer, set off and counterclaim seeking damages for breaches of contract and repairs made necessary by the sinking of the boat while work was in progress.

After extensive discovery and pretrial motions the case was tried non jury requiring all or part of eight trial days.

The court thereupon directed the filing of briefs and proposed findings with reply briefs due June 22, 1978. Defendant's briefs and proposed findings were duly filed but plaintiff's were not. As a result on August 3, 1978, the court at defendant's behest entered an order precluding plaintiff from filing briefs or requested findings. The court is therefore proceeding to adjudicate the matter without any argument or requests from plaintiff.

The court makes the following

B. Findings of Fact

(1) The plaintiff as dealer and the defendant as purchaser entered into a purchase agreement dated August 30, 1974, providing inter alia, for the sale and purchase of a new Morgan Out Island 36 Sailboat, No. 361–084, with the Sailaway Cruising Package, and other manufacturer supplied and dealer supplies options.

(2) At the time the parties entered into the purchase agreement, the vessel was in stock located in the storage yard of the manufacturer, Morgan Yachts, of Largo, Florida.

(3) Morgan Yachts had a published manufacturer's option list, but since the Vessel had already been constructed, certain manufacturer options were built into the boat, while others could not be added feasibly by the manufacturer in the Vessel's "as built" condition. Included in the former category were the deck color options and the ketch rig; in the latter category were the auxiliary generator and extra water tanks. However, many of the items appearing on the manufacturer's option list were still availa-

ble. Various additional options could be procured through the dealer—some of which the parties at that time were in a position to specify, others required further study and evaluation. Among the major items of equipment which had been discussed by the parties during the pre-contract negotiations, but not yet specified, were an auxiliary generator, refrigeration equipment and heating and air conditioning equipment.

(4) Although it was very late in the 1974 sailing season, the parties believed conceptually that the vessel could be ordered and received from the manufacturer in the fall of 1974, thereby permitting outfitting and the installation of additional options and equipment to be done during the off season (the winter months of 1974–75), enabling the vessel to be ready for the start of the 1975 sailing season.

(5) In order to afford time for study and evaluation of options available through the dealer beyond those specified in the purchase agreement, the agreement states that "Dealer agrees to supply and furnish purchaser such other accessories and equipment for installation on, or for use in connection with, the Out Island 36, as purchaser may order from dealer at any time prior to April 30, 1975, at dealer's cost, plus time and material for installation, provided such other accessories and equipment can be reasonably obtained by dealer. Counsel for plaintiff acknowledged that $5,000 or $6,000 of such extras were contemplated.

Moreover, consistent with the overall plan that the dealer would be working on the vessel over the winter months, the purchase agreement states that "Dealer agrees to provide purchaser . . . with winter storage for the period through *April 30, 1975* at dealer's facility near the public docks at Erie, Pennsylvania." (Emphasis added)

(6) It was expected that the dealer would complete its performance by April 30, 1975, the approximate beginning of the 1975 sailing season, and the contractual provisions

---

1. The boat's owner Edwin L. Klett, a Pittsburgh attorney, is actually the defendant.

referred to above are consistent with this completion schedule.

(7) With respect to express warranties, the purchase agreement, besides identifying the vessel as a "new Morgan Out Island 36 Sailboat, with the Sailaway Cruising Package", and with specified manufacturer supplied and dealer supplied options, states that "[t]he manufacturer and dealer warrant that the Out Island 36, together with the options installed thereon, and the equipment and material furnished hereunder, will be free of defects in material and workmanship for a period of one year after delivery to purchaser."

(8) There are no provisions in the purchase agreement which exclude implied warranties, limit remedies, or restrict the recovery of consequential or incidental damages.

(9) The purchase price under the purchase agreement was $43,423.85, less $9,000 for a used vessel tradein, plus sales tax of $2,065.43, for a net amount of $36,489.28. Since the parties contemplated that additional equipment would be supplied and work done by the dealer, the purchaser remitted the sum of $38,000 upon the arrival of the vessel in Erie, Pennsylvania, on or about October 1, 1974.

(10) The vessel was delivered to Erie Yacht Club facilities where defendant was a member and thereafter removed to plaintiff's facility at English Whipple Sailyard.

(11) It was reasonably within the contemplation of the parties under the contract relationships and the scope and manner of the work to be performed that plaintiff would use reasonable care to protect and safeguard the vessel while it was within its custody and control for work and storage.

(12) Plaintiff impliedly warranted that the vessel and all equipment installed thereon and supplied therewith would be merchantable and would pass without objection in the trade and be fit for the ordinary purposes for which the vessel was to be used.

(13) As a consequence of defendant's overpayment of the stated purchase price under the purchase agreement and in view of the fact that plaintiff had yet to perform any work on the vessel, defendant in the early fall of 1974 requested that plaintiff return to defendant the sum of $5,000 to be held pending plaintiff's performance of the work under the purchase agreement. Plaintiff agreed, but plaintiff never performed.

(14) In the fall and early winter of 1974, progress on the outfitting of the vessel at plaintiff's sailyard proceeded with the purchaser being engaged in the selection of the major additional systems to be installed on the vessel and with the dealer occupied with rigging and performing some outfitting on the vessel. By January of 1975, purchaser had procured and the dealer had on hand the refrigeration, ice making, and heating/air conditioning equipment to be installed on the vessel. Although tentative arrangements had been made by the dealer for the procurement of new auxiliary generating equipment, these arrangements were voided when identical equipment of the same manufacturer became available at a nearby shipyard on a used basis at a substantial discount from the price of new equipment. No written confirmation of the price or other terms of purchase was exchanged between the parties, and the evidence is in conflict as to precisely what price, if any, was cleared by the dealer with the purchaser. It is agreed, however, that the price was to represent a substantial reduction from that of the new equipment, possibly as much as $1,000 according to plaintiff's president. Plaintiff's president also claimed that the seller of the used equipment provided a full warranty; but yet the seller (Paasch) maintains that it was sold on an "as is" basis, without warranty. The record reflects that the used equipment was purchased by the seller in 1972 for $2346.64; that he was offered a tradein the winter of 1974 of $2103 on the purchase of larger equipment; and that he gave his customer a $2500 allowance against the price of the new equipment. The court finds that the seller was entitled to a reasonable profit on the transaction and that

the fair market value of the used equipment in the winter of 1974 was $3000.

(15) Since approximately mid November 1974 the vessel was tied up at the rear of plaintiff's dealership located on the west public dock west of State Street in Erie, Pennsylvania. The vessel was located in what is known as the west canal basin [2] and was tied up at the end of a T-dock. The water in this canal basin is normally not subject to freezing conditions, at least as long as the nearby electric generating plant discharges thermal wastewater into the basin. The general area where plaintiff's dealership was located would be considered as "isolated" during the winter months, and a likely area for thefts and acts of vandalism. During the preceding two or three year period, plaintiff itself had been subjected to various breakins, thefts, trespassing, as well as sundry acts of vandalism. Except where the rear of plaintiff's property adjoins the canal basin, access to the rear yard area in which the vessel was moored, was restricted somewhat either by 5' to 6' high anchor fencing or by the building structures themselves. It was the impression of the court, however, as gleaned from a view of the premises, that an agile person would have no difficulty gaining access to the rear yard area. Of course, access by water from the canal basin which opens into Presque Isle Bay would be open and unrestricted. Plaintiff's president acknowledged that on various occasions fishermen and other interlopers were observed to have surreptitiously gained entrance to the rear yard area. At night a single street light type of fixture erected on a pole in the rear yard provides general illumination of the rear yard area but there is no direct lighting on the T-dock where the vessel was moored. It was also observed by the court that an adjoining property owner had installed several strands of barbed wire above the normal height of fencing for the purpose of further impeding the entry of unauthorized persons but that a gate to the west was only 5 or 6 feet high and could easily be scaled.

(16) Plaintiff's president testified that he did little, if anything, to winterize boats which were in the water at the rear of his facility because of the comparatively warm temperature of the water in the west canal basin. However, defendant's expert, together with the successor owner of plaintiff's dealership effective June 1, 1975, agreed that winterizing was a normal procedure even if the vessel was to stay in the warm water. In any event, it was open to snow, rain and ice storms.

(17) By mid February 1975, plaintiff had made some progress in rigging and outfitting the vessel but there were several manufacturer supplied options which plaintiff had yet to order and few of the options to be supplied by the dealer which actually had been installed or were aboard the vessel. In anticipation of the vessel's being transported to an adjacent marine facility for installation of the used auxiliary generating equipment, plaintiff had arranged to have removed a 4 × 4 foot section of the center cockpit. Plaintiff was not expected to complete its performance until April of 1975, and thus at this time was somewhere in mid stream. The court specifically finds as a fact that plaintiff had not completed its agreed upon performance on February 16–17, 1975.

(18) Between the hours of 7:00 p. m. on February 16 and 7:00 a. m. on February 17, 1975, the vessel for reasons unknown sank where it was tied up at the rear of plaintiff's facility. The condition of the vessel was discovered at approximately 7:00 a. m. by the same neighboring marine dealer who was scheduled to do the installation of the auxiliary generator, and plaintiff's president was advised by telephone of the problem. Plaintiff called the Erie Fire Department at approximately 8:00 a. m. and requested that they aid in raising the vessel by the use of large auxiliary pumps. The firemen responded promptly, and by approximately 9:30 a. m. the vessel was again afloat in the water. Three of the firemen

**2.** This area is known as the "Canal Basin" because it was the basin at the north end of the Pittsburgh and Erie Extension canal abandonment c. 1870.

who responded testified in the trial and confirmed that the water had entered the vessel through an open sea cock. An engine cooling hose was attached to the sea cock and the other end of the hose was disconnected from the engine and was observed to be flopping about before the sea cock was closed. The firemen were also in agreement that plaintiff's president had said that he had no portable pumps which were operable at the time. Plaintiff's president at the time uttered exclamations varying between blaming his employees for the sinking, to putting the responsibility upon vandals. There is some evidence that other acts of vandalism occurred at this time, but it is equally possible that they occurred at different times. Plaintiff's president also indicated that the padlock on the front gate may have been left unlocked. It was an ordinary padlock, and customers of plaintiff had access to the yard. No special precautions had been taken by plaintiff to safeguard the vessel during the approximate six week period that the cockpit sole was removed. Only a tarpaulin like cover had been placed over the gaping hole and tied down on one side. However, access to the engine compartment of the vessel could have been easily gained. Plaintiff did not employ any night watchmen or have installed in the rear yard any electronic warning aids. The court specifically finds that the precautions and safeguards undertaken by plaintiff to protect its rear yard area, and more specifically, the vessel at the time of the sinking were inadequate, and certainly must be deemed to be a proximate cause of the loss. Plaintiff's lack of concern for the security of its front gates may have provided easy access to plaintiff's rear yard on the occasion of the sinking. In any event, the circumstances surrounding the opening of the sea cock which was the immediate cause of the sinking are unknown. At best mere speculative theories exist as to how or why the cock came to be open.

(19) Within a day or two after the sinking, plaintiff's president advised defendant's owner that the extent of the repairs necessitated by the sinking were minimal, in the approximate range of $2,000 and that the sinking would not cause a delay in plaintiff's completing its performance in time for the start of the 1975 sailing season. Defendant relied upon plaintiff's representation in electing not to rescind the purchase agreement and recover the purchase price, as he believed he had a right to do under the provisions of the Uniform Commercial Code.

(20) Thereafter, it appears that plaintiff commenced making certain repairs and performing other work contemplated by the purchase agreement, although it is questionable whether the nature and extent of plaintiff's undertaking were reasonably geared to deal with the special problems created by the sinking, as well as the rapidly advancing time for the start of the 1975 sailing season. There is no writing between the parties under which either plaintiff or defendant assumed responsibility for the repairs and defendant denies making any such promise to the plaintiff. In the absence of reliable evidence of the existence of such a commitment by the defendant, this court finds that none did exist. It does appear, however, according to the defendant that sometime between February 16–17 and March 29, 1975 plaintiff inquired of defendant whether defendant's insurance carrier might stand for a $2,000 claim. Defendant allegedly replied by suggesting that plaintiff formulate an insurance claim statement and await the outcome of the insurance company's evaluation.

(21) On or about June 1, 1975, the plaintiff sold its business. The vessel was not completed at the start of the 1975 sailing season and was far shy of completion on June 1, 1975. After defendant inquired what was to be done in light of plaintiff's having sold its business, plaintiff arranged with the successor owner to undertake certain work on the vessel. However, delivery of the vessel to defendant did not occur until August 28, 1975, and even then, many items of equipment were missing, incomplete, improperly installed or functioning improperly, all in violation of the purchase agreement and the understanding of the

parties. Although afforded the opportunity to correct the defects and deficiencies and do other warranty work, plaintiff was unwilling or unable to do so, necessitating defendant's having to make arrangements with third parties for the necessary work to be done.

(22) Although the successor dealer advised defendant that the vessel was ready for delivery on August 12, 1975, plaintiff refused to deliver up the vessel unless defendant paid for the sinking repairs. Defendant declined, and instead under admiralty Rule E(5) instituted suit in this court at Miscellaneous No. 6309, posted a surety bond and obtained an order from District Judge Teitelbaum directing release of the vessel. On the same day a warrant of arrest in admiralty was issued.

## C. Discussion

### 1. Bailment.

 Williston quotes *State v. Warwick*, 48 Del. 568, 108 A.2d 85, as defining a bailment " 'as a delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it . . .' ". 9 Williston on Contracts § 1030, pp. 875-6. In Pennsylvania, when a bailment is shown to exist, the bailor has the presumption of negligence by the bailee, thereby shifting the burden to the bailee to show that he exercised reasonable and ordinary care. *Jackson v. Fort Pitt Hotel*, 162 Pa.Super. 271, 57 A.2d 696 (1948); *Moss v. Bailey Sales & Service*, 385 Pa. 547, 123 A.2d 425 (1956). If no bailment is shown, the alleged bailor must show specific acts of negligence on the part of the defendant.[3]

In Pennsylvania the cases involving a determination of whether or not a bailment exists between a motorist and parking lot owner seem to turn on the issue of which party exercised dominion and control over the car. In *Taylor v. Phila. Parking Auth.*, 398 Pa. 9, 156 A.2d 525 (1959), the Pennsylvania Supreme Court stated:

"Since here plaintiffs reserved possession of the car at all times *by retaining the keys thereto*, defendant acquired no dominion over the vehicle nor any right to control removal of it; hence there was no bailment." 156 A.2d at 527 (Emphasis supplied).

Accord, *Sparrow v. Airport Parking*, 221 Pa.Super. 32, 289 A.2d 87 (1972).

In a case rather similar to this, involving libel by a shipyard to recover charges for repairs to a vessel necessitated by its fall from a cradle constructed by the shipyard, and crossclaims by the boat's owner for damages, the court held that the storage contract of the boatyard was such that it became a bailee for hire. *Johnson's Branford Boat Yard, Inc. v. Yacht Altair*, 260 F.Supp. 841 (D.Conn.1966). In that case, the boat's owner delivered the boat to plaintiff for winter storage pursuant to a written contract and ordered certain repairs to be undertaken during the storage. The court did not discuss the bailment issue, and merely stated that "the proof clearly requires" the finding of a bailment.

In *Erlbacher v. Republic Homes Corp.*, 263 F.2d 217 (8th Cir. 1959), a bailment was created where a boat was taken to a shipyard for repairs and was left in the exclusive custody and control of the shipyard. The court held that "It is well settled that owners of a shipyard who take a vessel into their custody and control are bailees." It has also been held that the fact that a bailor shares the use of the thing bailed with the bailee does not necessarily cause a

---

**3.** The general rule in Pennsylvania is that the bailee must prove facts accounting for the loss of or damage to the bailed property in a manner not to implicate him in negligence. He must show loss by fire, theft or other casualty free from fault on his part. If he makes such a showing the burden then shifts to plaintiff to show fault on the part of the bailee. *Hearst*

*Magazines v. Cuneo Eastern Press Inc.*, 293 F.Supp. 824 (E.D.Pa.1968). *Girard Trust Corn Exchange Bank v. Brinks Inc.*, 422 Pa. 48, 220 A.2d 827 (1966). These rules apply to damage to a boat or barge in admiralty cases. *Consolidation Coal Co. v. U.S. Steel Corp.*, 364 F.Supp. 1071 (W.D.Pa.1975, McCune, J.).

termination of the bailment and create a new relationship. *Smalich v. Westfall,* 440 Pa. 409, 269 A.2d 476 (1970); *Rodgers v. Saxton,* 305 Pa. 479, 158 A. 166 (1931).

█ In the instant case, Charles Michael English, President of English Whipple Sailyard, Ltd., testified that both he and Edwin L. Klett, the owner of the Yawl Ardent, had keys to the vessel. (T. 58) He further testified that when the boat was at the Erie Yacht Club in the Fall of 1974, it was under power several times, but he could not state whether Klett was using it. (T. 48, 255-6) English also stated that he was directed by someone to put the vessel in a particular stall at the Yacht Club when it first arrived. (T. 356–60) Klett testified he made no arrangements with anyone at the Yacht Club for the delivery of the Ardent. (T. 613, 29) He further stated that he did not sail the boat anytime in 1974 (T. 631) and that to the best of his knowledge it remained in the Sailyard during the Fall of 1974 and Winter of 1975, except for possible use by English. Timothy Allburn, who was employed at the Sailyard at the time in question, testified that he saw the "Ardent" out once in 1974 and that he "believed" that Klett was operating it. (T. 380).

Obviously, if both Klett and English had keys to, and access to, the boat, (Klett testified that he took his family to sleep on the boat on the last weekend in October 1974), then plaintiff did not have "exclusive" custody and control over it. Based on the contract for delivery, storage, and repairs, however, the court finds that a bailment existed for the mutual benefit of the parties and that plaintiff was in possession and control of the vessel at the time of the sinking.

2. Purchase of Insurance by defendant.

█ Plaintiff contends that because defendant purchased insurance on the vessel a bailment could not have been created. It has been held, however, that the retention of insurance by an owner covering the bailed subject matter is not necessarily inconsistent with the intention to bail, *Banks v. Chas Kurz Co.,* 69 F.Supp. 1017 (E.D.Pa.

1947), and the court finds that Klett's purchase of insurance in this case did not negate the intention to bail the vessel.

3. Security at the Sailyard.

█ Given that a bailment existed, defendant has made out a prima facie case of negligence on the part of plaintiff, and plaintiff must show that the loss was not its fault, *Moss v. Bailey* supra because the bailee is held to the exercise of ordinary care and is responsible for ordinary negligence, but not for injury by accident or other faultless cause. 9 Willison on Contracts 1034. Plaintiff attempted to show this by establishing that vandals entered the sailyard and tampered with the sea cock on the "Ardent" causing the vessel to fill with water and sink. (T. 70–79)

The issue of the effect of a superseding cause on a bailee's liability has been addressed by Pennsylvania courts. In *Farley v. Sley System Garages,* 187 Pa.Super. 243, 144 A.2d 600 (1958), a motorist parked his car in a parking lot, the car was stolen due to the lot owner's negligence, and a third person was struck by the car as it was being driven by the thief. Although the court held that the lot owner was not liable to the injured third party because he owed him no duty to foresee that a thief would negligently injure someone, it also stated that since the lot owner was negligent in allowing the vehicle to have been stolen, he could not defend an action for damages to the car on the ground of superseding cause. "The reason for the rule is that [the lot owner's] negligence permitted damage to be suffered by the bailed property; [he] therefore violated [his] duty of ordinary care to protect the bailed property." (144 A.2d at 603)

Assuming, then, that vandals did tamper with the sea cock resulting in the sinking of the vessel, this superseding cause of the loss would not relieve plaintiff of liability if it, too, was negligent. The question, then becomes: did plaintiff exercise ordinary and reasonable care to protect the "Ardent" from such danger?

Initially, English testified that he had not had many security problems at the Sailyard (T. 56), but that children and fishermen were sometimes seen on the premises. (T. 283, 285) He stated that plaintiff does not employ a night watchman nor does any other marina in the State Street area of Erie. (T. 265) According to English, it was possible to climb the fence surrounding the Sailyard. (T. 283) He testified that installing an electronic alarm system would not have been a "good idea" (T. 284), although a deposition taken of Harold Paasch, another Erie marina owner, taken on December 22, 1976, states that he had installed such a system in 1972 to protect the boats in his yard. (deposition of Harold Paasch, p. 56) The night before the sinking, English had checked the premises and the gate to the yard was locked (T. 297), but the following morning it was open. (T. 298) All of the Sailyard's customers had keys to the entrance gate (T. 59) or had the combination to the lock. (T. 299)

Raymond Schweinberg, a lieutenant with the Erie Fire Department, testified that upon his arrival at the Sailyard on the morning of the sinking, English had stated that "the guys that were working on it [the "Ardent"] may have left it [the sea cock] open" or "some vandals came in." (T. 534) William Romance, another Erie fireman, testified that English said "Somebody goofed up." (T. 548)

Klett testified that English said vandals may have caused the sinking, or that it was an intentional act and "someone must have been out to get him," or that "one of his employees may have fouled up." (T. 808) Joseph Mozdy, a patrolman with the Erie Police Department, testified that on February 25, 1975, he was informed by English that other vandalism had occurred and other items had been taken from the Sailyard on February 16 and 17, 1975, the date of the sinking. (T. 554–55)

At Transcript 623, the court placed the following comments on the record following a view of the Sailyard property:

"The Court: The court conducted a view of the premises at 27 West Public Dock, Erie, Pennsylvania, on January 6, 1978, commencing approximately 12:15."

"The premises front on the roadway leading west from State Street at the Public Dock, and the north side of this roadway is contiguous to the waters of Presque Isle Bay."

"The premises consist of two buildings which occupy the entire frontage except for a driveway or other area to the east between there and the property of Erie Marine Supply, where there is a gate, a double gate with hinges for each gate on the end approximately six feet high, made of woven wire and padlocked in the center."

"Beyond that the court observed an area which has been stated was occupied by a building which has been torn down, and a fence approximately eight feet high has been erected along this point. Before the fence, the building wall would appear to have been the—to have blocked access to the southwardly—the property runs through to the waters of the west canal basin, and at that point there are various stalls for boats, and at the present time various boats are in storage for the winter."

"It has been stated that the Yawl Ardent was at the "T" at the end of a runway extending out into the canal basin where it is claimed to have sunk."

"The access to this open area south of the buildings to the east is blocked by the buildings of the Erie Marine Supply, which building wall extends to the water's edge."

"The southern part of the premises, of course, are open to anyone coming by boat through the waters of the canal basin."

"To the west there is another building of the Erie Marine Supply which blocks access for part of the area. The balance of it seems to be covered by steel frames."

"Beyond that is another fence. However, again the court observes that beyond the fence, the west boundary of Erie Marine Supply—or is that Nolan next door?"

"Mr. Griffin: This is Nolan right next."

"The Court: All right, change Erie Marine Supply to Nolan Shipyard—is another fence. However, an agile person could easily work himself around the end of the fence where it comes to the water's edge or the bulkhead at the water's edge."

"Mr. English: With reference to where you said that they could easily work themselves around, can we make that clear that's not on the sailyard property?"

"The Court: That's right. That fence is at the west boundary of Nolan Shipyard. There is *no* fence between Nolan Shipyard and the property of the sailyard."

"The court observed one light on a pole in the open area to the rear. The light is similar to a street light."

"Mr. Toohey: Your Honor, the sailyard to the east also has a fenced area between its building and its dock, and above that is it looks like a six foot fence, to about ten feet in the air."

"The Court: That is correct. There was barbed wire there. There is a fence between Erie Marine and Nolan to the west."

"Mr. English: These two buildings here are contiguous.

"The Court: That's right. The buildings appear to be contiguous, so that there is no opening between them. All right, I think I have got a good idea of the thing. The court further observed that west of the Nolan Shipyard is a driveway between it and Erie Marine Supply which was protected by a double gate approximately five and a half feet high of woven wire. This is inside the fence previously referred to on the west boundary of Nolan Shipyard."

A somewhat similar case is *Johnson's Branford Boat Yard, Inc. v. Yacht Altair,* supra, in which a boat was damaged when it fell from a cradle constructed by the plaintiff shipyard at which it was being stored. The court in that case stated: "I am satisfied that all experts gave their best and most honest opinions but neither they nor the court will ever know why the cradle collapsed." In finding for the vessel's owner, the court held: "Although there was credible testimony on behalf of the Yard that its cradle construction was adequate, there was equally credible testimony to the contrary. The Yard, therefore, has not overcome the presumption imposed by law and must be held liable for the damages caused by the fall." (at 844)

Similarly, in the instant case, there is speculation that vandals opened the sea cock, that plaintiff's employees may have opened it or that persons unknown may have opened it. Even if the court accepts the testimony that vandals or unknown persons opened the sea cock, plaintiff must prove that all reasonable precautions had been taken for safe storage of the vessel and that forces beyond its control were responsible for the sinking.

 The court has considered the usual practices along the Erie waterfront, the reasonableness of those practices, and plaintiff's prior experiences with vandalism or intruders which would give it notice that additional safety measures were required. As discussed above, plaintiff's security was similar to that of many other marina owners in the area, but given the easy access to the Sailyard, this security was unreasonable and inadequate, especially given the value of the vessels stored there. Consequently, defendant is entitled to damages for the repairs necessitated by the sinking and plaintiff is precluded from recovering for any such repairs conducted by it. Defendant is also entitled to recover the fair market value of the items of personal property lost during or following the sinking.

4. Damages.

The court again wishes to emphasize that it is required to proceed without requests for findings or brief on damages filed by plaintiff.

 (A) Under U.C.C. § 2–715, defendant is entitled to recover consequential damages which were reasonably foreseeable from his known needs. Specifically, consequential damages include any loss resulting from the general or particular requirements and needs of the buyer (1) of which the

seller had reason to know at the time of contracting and (2) which could not be reasonably prevented by cover or otherwise. Consequential damages may be determined in any reasonable manner and mathematical proof is not required. The damages claimed, however, must not be so indefinite as to be conjectural or speculative. 2 Anderson, U.C.C. § 2–715:16, pp. 472–3; *R. I. Lampus Co. v. Neville Cement, Etc.*, 474 Pa. 199, 378 A.2d 288 (1977)

The most significant item in dispute in the instant case in this category is the claim in Ex. 1–E for loss of income from chartering. Klett testified that in August 1974 after returning from the Morgan plant in Florida, he talked with English (T. 583) about chartering the boat. According to Klett, chartering "was something that was in the back of my mind," (T. 585) and "my discussions with Mr. English about chartering were very, very minimal at that time, but I do have a present recollection of Mr. English indicating that as a service to his customers, he provided chartering leads, and he also indicated that in return, he expected to be able to use the boat as a demonstration boat for promotional purposes." (T. 586) Klett then stated that: "my recollection is that I did not take Mr. English up on his offer to provide chartering leads because of the conditions which he attached." (T. 589) He further testified that he was interested in chartering the boat because it would enable him to defray some of the expense (T. 776), and that English had told him that he was able to charter a 33' Morgan for $350/week. On cross-examination, Klett stated that he indicated to English that he was not interested in chartering the boat if it meant that English "would have the prerogative of using the boat as a demonstrator. I did not say that I was not interested in chartering the boat." (T. 865) Klett has never attempted to charter the "Ardent." (T. 866)

John Douglas, defendant's expert, testified that the boat could be chartered for between $500 and $700 per week. (T. 925) Michael Griffin, plaintiff's expert, testified, however, that he would "find it very hard to believe" that the boat could be chartered for two sailing seasons for a period of eight weeks per season at a rate of $600 per week. (T. 1002)

Klett's testimony suggests that although he may have had a desire to charter his boat to defray expenses, the only communication he made to English in this regard was a rejection of English's offer to provide chartering leads because of the condition which English attached to this service, namely his prerogative to use the boat as a demonstrator. Consequently, income from chartering does not appear to have been reasonably foreseeable to English at the time of contracting and defendant should not be able to recover this amount. In any event, the court finds that this evidence is too speculative to serve as a basis for an award of damages.

A second minor item of consequential damages which may be disputed is the amount claimed by Klett for his labor in repairing parts of the vessel. The expense of making repairs, even though conducted by the damaged property owner himself, is recoverable as consequential damages. 2 Anderson, U.C.C. § 2–715.29, pp. 480–81. *Crain Brothers, Inc. v. Duquesne Slag Products Co.*, 273 F.2d 948 at 952–53 (3rd Cir. 1959). Various figures were given regarding the cost of labor. Griffin testified that he charged Klett $7.50/hour in order to "be fair." (T. 407) Griffin further testified that his normal rate was $12/hour and that this was reasonable. (T. 414–15, 500) Douglas testified that he charged $15/hour for installing the 2 40-gallon water tanks. (T. 950) Therefore, the court finds that the $10/hour claimed by Klett on Ex. 1–C for his labor is reasonable.

A third disputed item of consequential damages is the diminished value of the vessel after sinking. Douglas testified that the boat as delivered was worth $45,000 in the Fall of 1975, while as warranted it was worth $51,000 to $55,000. (T. 924) Klett claims a diminished value of $6000. (Ex. 1–E) Griffin testified that in the Fall of 1975 the boat would have had a market value of 5% less than $48,000, or $45,600.

(T. 985) Consequential damages are recoverable for the diminution of market value, i. e., the economic loss due to the defective product not having the value it would have had if not defective. *Kassab v. Central Soya*, 432 Pa. 217, 246 A.2d 848 (1968). The court notes that Griffin had not been aboard the vessel since the Fall of 1975 (T. 1011) and was not familiar with some of the options which were to have been provided (T. 1011–13), and therefore finds that defendant is entitled to $6000 as diminished value.

■ Since the vessel was not completed in time for use during ¾ of the 1975 sailing season (despite assurances by plaintiff, even after the sinking, that it would be finished by April 30, 1975) (T. 701–04, 824–27, 831–33), defendant is entitled to damages for ¾ of the amount spent by him for docking and other amounts he was required to expend in anticipation of being able to sail during the entire 1975 season. This amount, as set forth in Ex. 1–B, is recoverable as consequential damages under U.C.C. § 2–715.

(B) In addition to consequential damages, other questionable items are (1) repayment of $5000 resulting in loss of use of money, (2) reasonableness of charge for water tanks, (3) reasonableness of charge for generator and (4) detention damages.

■ (1) Repayment of $5000. Klett contends that a portion of the excess funds which he paid English initially should have been returned to him to be held in escrow pending plaintiff's completion of performance. (T. 615–16) Defendant testified that he spoke with English about this matter and that English agreed to return $5000 (T. 615–16), but failed to do so. (T. 628) English contends that he never had any such discussions with Klett. (T. 54) Klett maintains, however, that he learned from English that the Sailyard was involved in an NSF check situation at its bank and could not make the payment at that time. (T. 628) Since English acknowledged having been involved in an NSF check matter (T. 36, 275–79), Klett contends that the subject of the $5000 repayment must have been discussed or he would have had no way of knowing this detail about plaintiff's financial affairs. This is certainly a plausible explanation, but the court notes that English testified that he bounced quite a few checks (T. 36) because of a cash-flow problem and therefore wanted immediate payment from Klett. (T. 277) Consequently, the subject of NSF checks could have come up in a conversation concerning the initial payment by Klett (i. e., "Pay me in cash now because we have had NSF problems in the past because of cash shortages"), rather than in a conversation regarding the $5000 repayment specifically. English, however, did not offer this explanation so the court is left with a question of credibility. We find for defendant on this item, and interest will be assessed on the $5000 from September 1, 1974 until April 30, 1975, the date upon which the work was to have been completed, for a total of 7 months ($175).

(2) Reasonableness of expense of 2 40-gallon water tanks. In its pre-trial brief, plaintiff mentions this specifically as a disputed item. In Ex. 1–A, defendant claims $997.04 as the cost of installation of 2 40-gallon water tanks and pipe. English testified that 2 40-gallon bladder type tanks could have been installed for $140, but that Klett did not want that variety. (T. 336) He also testified that it was not practical to install solid tanks on this particular vessel (T. 336), although Klett testified that English never told him it would be impossible to install the stainless steel variety without removing a large portion of the forward compartment of the boat. (T. 875) Klett further testified that "The material was never discussed and is not material to me even today whether stainless steel, whether it is plastic or one of the other plastic derivatives, or whether it is a flexible tank . . . it is not material to me today as to type of material, unless upon further investigation I concluded that one type could not be used for water [because of possible contamination]." (T. 876) Klett also stated that no tanks had been installed but that Douglas was considering installing the flexible type and that a significant portion of the price of installation involves relocation of the refrigeration compressor to the engine room area in order to make

space available for the tanks under the settee berths. (T. 877) Klett denied that English recommended bladder type tanks and that he refused to accept them. (T. 878) Douglas testified that the $940.60 charge for installation of the tanks was reasonable and in accordance with the standards of the trade (T. 931–2), and that one-half of the cost of the $585 labor charge for this installation, or $292.50, was attributable to moving the refrigeration unit (computed using a labor charge of $15/hour). (T. 949–50) Griffin stated that this charge was "quite excessive," (T. 990) and that he could probably install the tanks in 20 hours instead of the 39 hours estimated by Douglas. He testified that this installation could be accomplished without moving anything around. (T. 992) The court allows $432.50 ($140 for the installation and $292.50 for the labor) for this item.

(3) Reasonableness of charge for generator. Defendant acknowledges that he owes plaintiff the cost of the installation of the Onan 7½ kw generator by Harold Paasch, but contends that the amount due should be $2500 rather than the $3200 claimed by plaintiff ($3392 including tax, T. 126). Klett testified that on January 6, 1975, he had a conversation with Bud Shelby, an Onan generator distributor, who told him that the list price of the 7½ kw generator model Klett desired was $2936 as of January 1, 1975, and that a dealer was typically entitled to a 10–15% discount from that list price. (T. 647–8) A day later, English told Klett that he could get the same model in a used generator from Harold Paasch and that since it was used it would be "available at a substantial discount from what it would have been to procure a new unit." (T. 653–4) Douglas testified that the reasonable market value of a used 1972 Onan 7½ kw diesel generator with sound shield in the winter of 1974–1975 was about $2500. (T. 937)

English's version of the discussions regarding the purchase and installation of a generator was that he learned from Paasch that a used 7½ kw Onan generator was available for $3200 and that he, Paasch, would install it. (T. 81) English testified that he discussed the price with Klett (T. 81, 259) and that Klett inquired about the price of the used generator as compared with that of a new one. (T. 259) English informed Klett that he was not getting a significant discount in price, but that Paasch had agreed to install it, and since "you get the best service on the Waterfront with Harold Paasch . . . , it seemed like a nice marriage." (T. 259) On cross-examination excerpts from English's November 29, 1976 deposition were read. At that time, he had stated that the price of the used generator from Paasch was to be "slightly less" than the cost of a new model, but he could not recall exactly how much less. (T. 261–2) English later testified that compared with the prices obtained from other distributors of new generators, Paasch's price was the lowest. (T. 1052) Finally, English testified that he had never installed a diesel generator before and did not believe that anyone on the Erie waterfront had done so except Paasch. (T. 260)

Considering that Harold Paasch was considered to be the best, and perhaps the only, person on the waterfront capable of installing a diesel generator at that time, that a trade-off apparently was made between getting a new generator and then waiting to locate someone who could install it and purchasing a used generator from Paasch on the condition that he would install it, and that as a seller Paasch was entitled to make a profit on the sale, the court finds that $3000 was the fair market value of the used equipment at that time. Therefore, plaintiff is entitled to this amount rather than the $2500 conceded by defendant to be due it.

(4) Detention damages. In addition to these itemized damages, defendant also seeks a further award in the form of detention damages. In Pennsylvania, compensation for delay in payment after loss measured by the legal rate of interest is permitted if the finder of fact determines that under all the circumstances of the case the party against whom the damages are sought, rather than the party seeking them, was responsible for the delay. *Hussey Metals Div. v. Lectromelt Furnace Div.*, 417 F.Supp. 964 (W.D.Pa.1976); *Marrazzo v. Scranton Nehi Bottling Co.*, 438 Pa. 72, 263

880

A.2d 336 (1970). Such damages are permissible whether the loss involves use of property of a business or a personal nature. Restatement of Torts §§ 927 and 931(b), illustration (2); contra, *Johnson's Branford Boat Yard, Inc. v. Yacht Altair*, supra.

In this case, defendant was deprived of the use of his vessel beginning April 30, 1975, the date on which work on the "Ardent" was to have been completed. Although defendant is not entitled to the $9600 attributed to loss of chartering revenue and several other minor items of damages claimed by him, it cannot be said that he made an "excessive and unconscionable demand" thereby forcing plaintiff to protect himself by litigating the claim, *Pierce v. Lehigh Valley Coal Co. (No. 2)*, 232 Pa. 170, 172, 81 A. 142, 143 (1911), especially since this suit was initiated in 1975 by the Sailyard. Consequently, defendant is entitled to detention damages at the legal rate of interest on the fair market value of the vessel, had it been as warranted, on April 30, 1975, the date the work was to have been completed, or $51,000. The detention damage award, then, is $1020 which covers the period from April 30, 1975 to August 28, 1975 which we find to be the date of delivery for this purpose.

### D. Conclusions of Law

1. The court has jurisdiction over the parties and the subject matter in this action.

2. Plaintiff has failed to prove by a preponderance of the evidence that it is entitled to damages in the amount of the cost of the repair to the defendant vessel conducted by it following the sinking of said vessel in February 1975. Plaintiff is awarded only that amount conceded by defendant to be owing to it with the exception that the amount to be awarded for the cost of the Onan 7½ kw generator is increased from $2500 to $3000.

3. Defendant has proved by a preponderance of the evidence that plaintiff is liable for the repairs necessitated to the vessel "Ardent" as a result of its sinking in February 1975 and for damages attributable to plaintiff's failure to complete its obligations in a timely manner, excluding damages for lost revenue from chartering. Defendant is further entitled to detention damages in the amount of $1020.

4. Judgment should be entered in favor of the plaintiff in the amount of $3,481.25 and in favor of the defendant on its counterclaims in the amount of $18,756.71 in accordance with the attached summary.

### SUMMARY OF DAMAGES

| | |
|---|---:|
| Total of Defendant's Damages Attributable to Plaintiff's Failure to Perform as Contractually Required | $2,204.46 |
| Total of Defendant's Damages Attributable to Plaintiff's Failure to Complete the Vessel for the Start of the 1975 Sailing Season | 5,530.05 |
| Total of Defendant's Damages Attributable to Warranty Claims | 3,222.76 |
| Total of Lost or Destroyed Personal Property Belonging to Defendant's Owner | 289.94 |
| Total of Additional Damages of Defendant | 6,489.50 |
| Detention Damages Awarded Defendant | 1,020.00 |
| TOTAL DAMAGES DUE DEFENDANT | $18,756.71 |