Walter Jay Skinner, D.J.

**MARINE OFFICE OF AMERICA & DORYMAN FISHING CO.**
vs.
**MARINE CORP., d/b/a HYANNIS MARINA, INC. and HYANNIS MARINE SERVICE**

**Civ. A. No. 78-1132-MA**

United States District Court,
D. Massachusetts

**December 11, 1980**

Leo F. Glynn for the plaintiff.
James P. Whittiers, III for the defendant.

## OPINION

**MAZZONE, D.J.**

Plaintiffs filed this maritime action against defendants seeking damages for alleged negligence and breach of contract. Plaintiff Doryman Fishing Co. (Doryman), is a New Jersey corporation and the owner of the sport fishing vessel CHALLENGER I (CHALLENGER). Plaintiff Marine Office of America Corporation (MOA), a New York corporation, is the subrogated insurer of the CHALLENGER.

Defendants Marine Corporation d/b/a Hyannis Marina, Inc. and Hyannis Marine Service (Hyannis Marine) own and operate a marina in Hyannis, Massachusetts, at which the CHALLENGER sank on June 10, 1977. Hyannis Marine denies any liability for the sinking of the CHALLENGER, and specifically asserts the following affirmative defenses: failure to state a claim for breach of contract; contributory negligence; assumption of the risk; intervening cause; and act of God.

After a trial to the Court, and pursuant to Fed.R.Civ.P.52(a), the following findings of fact and conclusions of law are made.

## FINDINGS OF FACT

The CHALLENGER is a 27-foot, custom-built prototype sport fishing boat built by Gwenmor Marine, Inc. (Gwenmor) located in Mystic, Connecticut. The boat was equipped with a 280 horse-power Mercury engine, Navy outdrive, tuna tower and swordfish walk, dual controls, hydraulic

steering, reinforced fiberglass hull, and teak trim. It was originally purchased by Doryman in 1976 for use as a charter fishing boat, at an approximate cost of $15,000. Doryman thereafter leased a berth from Hyannis Marine for the CHALLENGER during the summer of 1976. At the end of the 1976 boating season, Doryman entered into an agreement with Hyannis Marine to store the vessel for the 1976-77 winter period. The vessel was hauled, winterized, and stored at the defendant's facility pursuant to this agreement.

During the 1976-77 winter, Doryman received a Summer Rate Schedule for dockage at the Hyannis Marina, a Dockage Reservation Form, and a blank form for suggested services to be requested in advance. The plaintiff returned the 1977 Dockage Reservation Form with a check for $100 requesting Berth #10 in Dock B. The defendant thereafter sent Doryman a Work Request Order soliciting its authorization of certain work recommended by the defendant to be performed on the CHALLENGER by the defendant before the spring launching. The plaintiff authorized that work on January 17, 1977 and requested that the vessel be launched on May 30, 1977. The vessel was actually launched on June 6, 1977.

On June 6, 1977, Mr. Octavious Orbe (Orbe) the Secretary of Doryman, arrived at the defendant's facility. He took the vessel out for a test run and observed that the port manifold appeared to be overheating. He brought the vessel back to the defendant's repair dock and requested that it be inspected. The defendant's employees removed the port manifold and cleared the manifold of rust, scale and filings. The engine was run at the dock and did not overheat. However, after Orbe took the vessel out again for another test run, he observed steam coming from the port exhaust manifold. The vessel was brought back to the repair dock and when the engine cover was removed, it was observed that the port exhaust manifold hose was leaking inboard of the transom flange. Orbe requested that this condition be repaired. The service manager advised that it would be repaired at once and Orbe left the facility.

On June 10, 1977, at approximately 12:00 P.M., the CHALLENGER sank at its berth at Hyannis Marina. At trial, various theories were advanced by the parties as to the precise cause of the sinking. Plaintiff's expert, an experienced marine surveyor, stated that in his opinion the sinking was caused by an influx of water through the port transom flange, resulting from defendant's failure to repair or failure to adequately repair the leaking port exhaust manifold hose.

The defendant's expert, Mr. Wayne Kurker (Kurker), owner and manager of Hyannis Marine, testified that in his opinion the sinking was caused by an accumulation of rainwater in the open cockpit of the CHALLENGER, which gradually lowered the stern of the boat to a point at which seawater could pour into it through the scuppers,[1] thereby swamping it very quickly.

At the time of the sinking, the CHALLENGER was in its berth at the marina. The evidence indicates that it had been raining all day, at times rather heavily. The defendant specifically assigned 2 or 3 dock-boys to monitor the (approximately) 70 boats in the marina and to report if any appeared in danger of sinking. None of these employees reported that the CHALLENGER was taking on water until it was too late to prevent her from sinking.

The CHALLENGER remained submerged for approximately 1 hour. Kurker thereafter removed it from the water using a fork-lift, had marina employees pump out the water, set the CHALLENGER on blocks in the marina parking lot, and proceeded to "pickle"[2] the engine in order to

---

[1] Scuppers are rectangular openings located on the port and starboard sides of the transom, approximately six inches above the waterline. Ordinarily, they serve to drain excess water from the deck. They are also equipped with rubber flaps on the outside of the transom, the purpose of which is to prevent water from entering the boat.

[2] "Pickling" is a process whereby an engine is flushed and filled with oil. This is done in order to prevent air from coming into contact with the salt water and metal, thereby causing oxidation and (possibly) ruining the engine.

prevent further damage due to oxidation.

On June 15, 1977 marine surveyor Robert Vorel inspected the CHALLENGER at the request of plaintiff MOA. Some days later, Doryman had the CHALLENGER transported to Gwenmor for an estimate and repairs.

The evidence indicates that Doryman expended the following sums for salvage, restoration, and repair work on the CHALLENGER:

| Payee | Description | Amount |
|---|---|---|
| Hyannis Marine | Salvage Charges | $300.60[3] |
| Gwenmor | Repairs and Hauling | 11,872.76 |
| Brower's Cove Marina | Replace Gas Tank | 1,446.45 |
| ? | Depth Recorder | 361.05 |
| ? | Fire Extinguishers | 43.50 |
| ? | Personal Items | 150.00 |
| | Total | $14,174.36 |

## CONCLUSIONS OF LAW

The Court has jurisdiction over the parties and the subject matter.

On June 10, 1977, the CHALLENGER was in the custody and control of the defendant, Hyannis Marine, for the purposes of making certain repairs and dockage. When a vessel is placed at a wharf or dock for storage and/or repairs, a bailment results for the mutual benefit of the owner of the vessel and the operator of the wharf or dock. **Stegemann v. Miami Beach Boat Slip,** 213 F.2d 561, 564 (5th Cir. 1954); **Selame Associates, Inc. v. Holiday Inns, Inc.,** 451 F.Supp. 412, 419 (D. Mass. 1978). Such a bailment imposes on the defendant a duty to exercise reasonable care in inspecting and caring for the boat while in its custody. **Id.**

We hold that Hyannis Marine failed to exercise reasonable care in this instance, and its failure was a proximate cause of damage to the CHALLENGER.[4] See **Fireman's Fund American Insurance Co. v. Capt. Fowler's Marina, Inc.,** 343 F.Supp. 347, 350 (D. Mass. 1971); **English Whipple Sailyard, Ltd. v. The Yawl Ardent,** 459 F.Supp. 866, 874-76 (W.D. Pa. 1978).

In **Fireman's Fund,** a yacht belonging to the insured was consumed by a fire of unknown origin while held under a contract for winter storage at defendant's dock. Defendant had no available source of water at the scene, and firemen were forced to use a public hydrant some distance away. The court found that, had the water been available 30 seconds sooner, the fire would not have reached the boat. 343 F.Supp. at 349. The court held that, under these circumstances, plaintiff satisfied its burden of proving negligence by demonstrating that defendant failed to employ a night watchman to report and control small fires, and failed to provide a source of water on the premises. **Id.** at 350. Significantly, the court also concluded that defendant's negligence proximately caused the damage to the yacht in question, notwithstanding the fact that the factual cause of the fire was unknown. **Id.** at 351.

**English Whipple** is even more squarely on point. There, the defendant's[5] yacht

---

[3] At the trial, plaintiff's counsel apparently assumed that the Hyannis Marine "salvage bill" included all the items on Plaintiff's Exhibit 5 (Hyannis Marine work order dated 6/6/77). However, we consider only $300.60 of the total invoice amount of $383.60 to be fairly attributable to the salvage operation.

[4] Plaintiff's complaint also contained claims for breach of a contract to make repairs and breach of warranty. Because the negligence issue is clear, and our decision on that claim is sufficient to grant the relief sought, we need not and expressly decline to decide whether Hyannis breached a contract to repair the port exhaust hose or failed to perform the repairs in a workmanlike manner.

[5] Like many cases of this kind, English Whipple originated as an action by the dealer/wharfowner to recover for repairs performed on the boat; wherein, defendant counterclaimed for damages to the boat as a result of the sinking.

sank "for reasons unknown" while at plaintiff's facility for the purposes of storage and outfitting. Upon raising the vessel, it was determined that an engine cooling hose had been disconnected, possibly by vandals, and that water had entered the vessel through an open sea cock. Rejecting plaintiff's defense of intervening cause (i.e., the acts of vandals) the court specifically found that the precautions undertaken by the plaintiff to safeguard the vessel at the time of the sinking were inadequate, and were a proximate cause of the sinking, in spite of the fact that:

> [T]he circumstances surrounding the opening of the sea cock which was the immediate cause of the sinking are unknown. At best mere speculative theories exist as to how or why the cock came to be opened.

459 F.Supp. at 872.

In the instant case, there is ample evidence to support our conclusion that Hyannis Marine was negligent. At trial, Kurker testified that because of the rain on the day of the sinking, there was nothing for the dock-boys to do except watch over the boats in the marina. In addition, Kurker stated that of the approximately 70 boats in the marina at the time, only 7 or 8 were power boats with open (i.e., uncovered) cockpits, to which heavy rain would pose a particular hazard. In fact, Kurker acknowledged that he instructed the dock-boys to watch the uncovered boats more carefully than the others. Under these circumstances, we have no difficulty reaching the conclusion that the defendant's employees were negligent, either in failing to cover the open boats to protect them from the heavy rain, or failing to notice that the CHALLENGER was taking on water and reporting that fact in time to prevent her from sinking. This is true regardless of the precise factual cause of the sinking.[6]

We reject defendant's affirmative defense of contributory negligence and assumption of risk. There was some dispute in the evidence as to whether the CHALLENGER was equipped with an automatic bilge pump, and whether the manually operated electric bilge pump was operable at the time of the sinking. In any case, the CHAL-LENGER was in the custody and control of the defendant, pursuant to an agreement for repairs and storage. Therefore, it was part of defendant's duty of reasonable care to determine whether the boat was equipped with adequate pumps and whether those pumps were operable, particularly where, as here, the defendant was **aware** that heavy rainfall might pose a danger to the CHALLENGER.

We also reject defendant's "Act of God" defense. The term Act of God is usually considered to cover losses resulting from lightning, earthquakes, tidal waves of great size, or extraordinary storms, such as hurricanes or typhoons. See 2A **Benedict on Admiralty**, § 152, 15-2 (1977). Viewing the evidence on this point in the light most favorable to defendants, there was no indication that anything more than heavy rain and some wind was involved in this case. Kurker himself acknowledged that it began raining before 8:00 A.M., the time he arrived at the marina. He stated that the sinking, however, did not occur until around noon. In response to questions on cross-examination, Kurker stated that the amount of rainfall between 8:00 A.M. and noon was "more than an inch." Considering all the evidence, we simply cannot accept defendant's contention that the sinking of the CHALLENGER was the result of an Act of God.

Having found liability on the part of Hyannis Marine, we turn to the question of damages. The plaintiff is entitled to recover only the fair value of those repairs reasonably necessary to rectify the damage caused by the sinking. See **English Whipple, supra**, 459 F.Supp. at 876-80.

Many of the parts replaced by Gwenmor cannot reasonably be found to have been

---

[6]Although we do not decide the question, we note our conclusion that Hyannis Marine was negligent is actually buttressed by the defendant's theory as to the factual cause of the sinking. If in fact the boat sank as a result of an accumulation of rainwater in the bilge, it would necessarily have taken some period of time in order to fill up to the point where the scuppers would be lowered to the water line. This would be true, in our view, regardless of the severity of the rainfall.

required as a result of the sinking. This is because many parts of a boat are specifically manufactured to be immersed in seawater, and others are made to withstand exposure to or brief immersion in seawater. We conclude that $2456.33 must be deducted from the amount listed for parts on plaintiff's Exhibit 6.[7]

We further conclude that the amount of labor (363 hours) required to make the repairs to the CHALLENGER was excessive in light of the damages caused by the sinking. After considering the testimony of both experts on this matter, we conclude that a reasonable amount of time to complete the necessary repairs would have been 175 hours.[8] Accordingly, $2820 of the amount paid Gwenmor for labor will be deducted from plaintiff's damages.

Finally, we reject plaintiff's contention that the following expenses were reasonably required as a result of the sinking: $1446.45 for the replacement of the CHALLENGER's gas tank two years after the sinking; and $361.05 for the installation of a new depth-recorder device.

Deducting the above amounts from plaintiff's proven expenditures, ante, at 4, we find that the fair value of parts and labor reasonably required to repair the damage to the CHALLENGER as a result of the sinking is $7090.53. Accordingly, judgment for that amount with interest is hereby entered in favor of plaintiffs and against defendants.

So ordered.
A. Mazzone, D.J.

[7]The following is a list of those replacement items which we conclude were not reasonably necessitated by the sinking:

| Description | Amount |
|---|---|
| 1 Engine Block and Heads | $1,298.00 |
| 2 Atwood Pumps and Auto Switch | 113.90 |
| 2 Salisbury Mufflers | 170.00 |
| 1 Sea Strainer and Fittings | 60.57 |
| 2 Exhaust Manifolds | 307.80 |
| 2 Exhaust Elbow Risers | 169.10 |
| 1 Fresh Water Exchangers | 314.50 |
| 2 Raw Water Pump Imeppelers and Drive Pins | 22.46 |
| Total | $2,456.33 |

[8]Plaintiff's expert Vorel testified that, in his opinion, 363 hours was reasonably necessary to complete the work actually performed by Gwenmor. Defendant's expert Kurker, on the other hand, opined that 125 hours should have been sufficient to perform all of the actual repairs (140 hours if "everything went wrong"). In attempting to arrive at a fair estimate of reasonably necessary labor-time, we have in mind both the fact that many of the repairs actually performed by Gwenmor were not reasonably required as a result of the sinking, as well as the fact that defendant's expert, as service manager of Hyannis Marine, may understandably have been somewhat conservative in estimating the time required to complete the necessary repairs. Finally, we note that in computing the sum to be deducted from plaintiff's actual expenses, we accept the figure of $15.00 per hour as a fair and reasonable rate for labor used in connection with the repairs.